While council are getting set up, I had forgotten to mention this morning that we have some students and faculty from St. Thomas University School of Law and we're very happy to have you here, hope you enjoy the proceedings. Okay, great, thank you. Glad to have all of you here. Our next case is number 18-11784, Mid-Continent Casualty Company v. Arpen & Sons, LLC. Mr. Oliver, you're going first? Yes, my name is Ralph Anderson and first of all, good morning and may it please the court. You're arguing for? I'm here on behalf of Appellant Lee Ellis Blue. Got it. Your last name is Anderson? Yes, my middle name is Oliver. Okay, got it. I had it mistakenly put here, my apologies. Go right ahead. Okay, again, Ralph Anderson on behalf of Appellant Lee Ellis Blue. At council table with me is David Weiss, who is representing Arpen & Sons in this case. This case arises out of a state court personal injury lawsuit which my client brought against Mr. Weiss' client, Arpen & Sons, arising from the catastrophic injuries that my client sustained at a job site in Miami, Florida. My client is now a double amputee of the arms because of what happened at that project. The trial judge in this case found that the Appellant Lee, Mid-Continent Casualty Company, insurance company, owed no duty to defend and no coverage obligations to its insured, Arpen & Sons, for any of the allegations in the underlying complaint. Now, the court essentially found as a matter of law that Arpen & Sons was a statutory employer of my client, Mr. Blue. Now, for that finding to be sustained, it requires an analysis of the controlling statute, which everybody agrees is controlling, is section 440.10, subsection 1B of the Florida Code. That statute provides, and I'll just quote a little bit of it, says, in case a contractor sublets any part or parts of his or her contract work to a subcontractor or subcontractors, all of the employees of such contractor, the statute goes on. But the key, two key aspects in that first part of the statute which are at issue here. One, there has to be an agreement between the entity that is under review with a third party, so that's the contract part. And then secondly, assuming that is found, then that entity has to sublet or subcontract out part of that contractual undertaking to someone else. Okay, let me, let's talk about the first part of that and I'll ask Mr. Weiss and Mr. Kammerer the same questions. And I know this doesn't get to the question of the agreement part, so we'll turn to that in a second. But there's no doubt in this case that Arpen undertook, insofar as state and municipal regulatory entities were concerned, the role of general contractor for this project, right? General contractor of record, yes, sir. Right, that part is, that part's undisputed. That's undisputed. Right, okay, so the question, one of the questions, not the only one, but one of the questions is, what sort of obligations flow from that? Are there any obligations in the absence of an agreement and a subletting or a subcontract or not? Insofar as the issue before the trial judge in this case, the coverage issue and the statutory employee analysis, no, I don't think so. Now, in the underlying negligence lawsuit that my client brought against Arpen, the fact that Arpen is the general contractor of record, that may have some bearing on its liability, but the question, it's very narrow, your honors. This issue is controlled by the plain language of section 440.10. And like I said before, without being a dead horse, there's two aspects to that, which is one, the underlying contractual agreement between the entity in question and a third party, and secondly, was any of that contractual agreement sublet or injured as a result? That did not happen in this case. Well, there was some type of agreement. It may have occurred after the fact, it may have been for inadequate or nonexistent consideration, but there was an agreement, whether it was a valid legal contract or not, maybe a different that Arpen would use its license to obtain all of the necessary permits as general contractor, right? That's correct. So you've got an agreement. Yes, your honor, that is an agreement. Okay. And that's the extent of the agreement. Well, what about the after the fact correspondence between Arpen and the church with regards to this tax benefit? By the way, I have no idea and the briefs don't explain what this tax benefit is even based on. Is it state law, federal law? Is it something that the church is able to assign? The only evidence of that comes in the deposition of Mr. Arpen and through those two documents that you referenced, the so-called invoice and the so-called tax credit letter. That's what the judge called it. Here's the testimony from Mr. Arpen. Was this something, and we're referencing the so-called invoice, was this something, this is the question, something that Arpen and Sons provided to Faith Deliverance Church in connection with its involvement in the project? Answer, that's my, I generated that thinking that without talking to Pastor Rory, that's the gentleman in charge of Faith Deliverance Church, without talking to Pastor Rory, thinking, well, that's a non-profit institution, so possibly I could get a tax deduction for doing that. And upon showing it to my accountant, he had a statement which we will not repeat, but said, you may as well forget about that. That is the testimony. And then we have the . . . Counsel, can I ask you a question? I think we know what that testimony is, but I want to make sure. Your client got paid a check, a paycheck, prior to his injury, like a month before his injury, right? There is a dispute as to those things. There is no dispute, Judge, that my client was not employed by Arpen and Sons. Counsel, listen to my question, okay? Your client got a paycheck, one paycheck. I think it was about a month before the injury, and I think it was described as not deposited until after the injury, perhaps even, but that it was to allow him to get workman's compensation coverage. Is that correct or not? Arpen, Mr. Don Arpen, not my client, Your Honor, undertook at first to . . . Did your client get a check, paycheck? I'm sorry? Did your client get a paycheck from Mr. Arpen a month before the injury? I'm not sure that my client has testified about it, but I know that in the record, there is an indication of a check. Did your client get approximately $369,000 in workman's compensation benefits, $100,000 in medical and maybe $269,000 in pay after the injury? Yes, sir, Your Honor. My client has received a lot, and that's the second issue dealing with . . . Are you not concerned about your client participating in workman's compensation fraud if he's not an employee? Our position has been . . . the position that we're taking in this case is not inconsistent with anything that we've taken from the beginning of this. This lawsuit, ever since this lawsuit was filed, this issue has been going on, and the workers' compensation insurer has, in fact, filed the lien in the underlying . . . State tort action, right. All right, so under the . . . isn't one of the reasons why the State of Florida requires a general contractor on jobs like this is to assure, with regard to the State interest, that there's at least a certain degree of procedure to make sure that employees, workers, the public, et cetera, are protected from injury, jobs are done correctly, things like that. Isn't that part of the reason why the State has a scheme involving general contractors? That is, I'm sure it is, Your Honor, but respectfully, the actual, I suppose, the controlling State interest is in the plain language of the statute itself, and that's what actually governs the whole statutory employer-employee analysis is 44010.1b. But what do you make of the Orama case? Orama case, yes. Two things. I have two answers to that. Number one, factually, it doesn't even resemble this case because the so-called, or the entity that was allegedly, that was deemed the general contractor in this case was literally involved with the actual underlying construction project up to the proverbial years. But as to the actual, I guess, broader holding of Orama, which is that if you act as a general contractor, you're going to be the statutory employer as a matter of law, no matter what. We believe that that Orama case is an outlier. The Wellington case, which this court decided, I understand it's an unpublished decision, therefore not binding, but it's persuasive. It directly applies the plain language of 44010. And the other cases that we cite do the same thing. Just because you put on a general contractor hat, in our opinion, the great weight of authority is that that doesn't qualify you or make you a statutory employer unless those two preconditions of 44010 are met. All right. Thank you very much. Thank you. You've saved your full time for rebuttal. Mr. Weiss. If I could please the court. Needless to say, Mr. Anderson addressed most of the things that I'm concerned about. Let me state at the onset, I was involved with Mr. Arpin in the underlying lawsuit because MidContinent refused to provide him with a defense. And we were always of the position that the actions of Mr. Arpin in that underlying case did not and will not, when and if that case is actually tried, create any liability on his part. The reality is that the obligation created that made Mr. Arpin a contractor for purposes of statute is all it did. It made him an obligor as under the contract, which under the facts of the case, if he were sued for the alleged negligence during the construction, would create liability on his part. But the reality is that all he did was volunteer something for which he never got paid. And I think that's been addressed. But by doing what Arpin did, it facilitated and actually allowed workman's compensation coverage for Mr. Blue, did it not? The reality is, and this is in the record, the payments of workman's comp actually were voluntary acts done by the insurance company. Well, that's a matter of dispute. They certainly don't see it that way. Well, they did claim a lien and respectfully, because this is kind of what I do, defending these kinds of cases in civil court is what I do for a living. They paid it out. They know that Mr. Blue has a viable claim, if not against Arpin, against a whole bunch of people. So the recovery back of that money in the real world, not necessarily in a legal sense, in the real world, is just a loan, for lack of a better term. Because as Mr. Anders pointed out, they have claimed a lien against the proceeds recovered by Mr. Blue in the underlying lawsuit. Can I ask you a question? Yes, sir. Sure, of course. Did your client ever disclose to the state of Florida authorities, local authorities, that that company was only taking on the responsibilities of allowing their general contractor's license number to be used to apply for the permits? That that's the only part that they were playing in this, yes or no? The answer is no, but it's not asked in the application. Okay. All right. Did your client, wouldn't your client have been just as entitled to any tax benefits for voluntarily contributing services to a not-for-profit charitable type entity or religious entity? Hang on just a second. I'm sorry, sir. It's okay. I'm not saying it would have been good to begin with, okay, but did it really make any that an invoice was sent to the church? I believe it was a church authority or whatever the entity was. Did it make any difference that an invoice was sent and a letter received from your client? In reality, couldn't your client have claimed that he made the contribution regardless? I guess in the world that we actually don't live in, the answer is yes, but he didn't. And it's uncontroverted that he didn't. In the motion for rehearing and the summary judgment, an affidavit was filed which made it clear the basis under which he did it because that occurred to him. I'm sorry, go ahead. I didn't mean to interrupt. Next question. Did your client disclose to the workman's comp carrier either at the time of securing the coverage for the employees or at the time of disclosing the accident in the form of actually filed the notice of claim which probably was his obligation or the company's obligation? Did your client disclose that the person who was injured, Mr. Blue, was in fact not an employee of your client? The answer is yes, and as a matter of fact, the claim was originally denied for that basis. Put in there that this is not an employee of mine and didn't say that he was obligated to pay workman's comp? No, the second part of what you just said I'm not certain of because frankly I don't remember that. Okay, so would your client have said, for instance, he's a statutory employee, he's not an actual employee but was a statutory employee under Florida law, is that what occurred? Again, you're asking . . . If you don't know, it's okay. The answer is I really don't remember. I don't think the original application says he's an employee or a statutory employee. I do remember that during the course of the deposition of the person up in Atlanta that issue was discussed at some length. But your client did issue a paycheck to Mr. Blue approximately a month before the incident? My recollection is that anything he did was post-accident and done . . . and again, I could be wrong. Are you saying he backdated a check? No, I'll tell you what my recollection is and I could be wrong in which case I apologize to the court for a statement. My good faith recollection is that Mr. Arpin, because of the horrendous injury that Mr. Blue had suffered, wrote checks in the idea of perhaps protecting him from the comp without understanding, of course, what followed. Protecting who from the comp, Mr. Blue or from . . . Mr. Blue getting the comp. Somebody asked the question about criminal, about fraudulent claims. That issue's never been raised. Are you concerned about it? Would I be if I was involved at the time? Yes, sir. Okay. Thank you. I have another question if it's okay with you. Sure. Do you concede that if we look just at the four corners of the complaint that there was no duty to defend here? No. And why not? Because Mid-Continent, there's a whole bunch of different complaints. I was involved in this case up to the last complaint being filed and Mid-Continent saw that the allegations, if proven, brought . . . recreated for them an obligation to defend. And they, in fact, hired a lawyer to defend Mr. Arpin at the end. Thank you. But piggybacking on that, if I could have one more question. Yes, sir. If, in fact, there was no duty to defend, would you agree that there's no duty to indemnify? It depends if it's determined as a matter of law there's no duty to defend. If Mid-Continent . . . Right, a matter of law. Yeah, the answer is sure. Okay, thank you. Oh, but . . . I'm sorry. Don't concede too much because, on a duty to defend, you are bound by the four corners of the underlying complaint. Understood. Should it turn out that what's proven is different than what's alleged, you may have a scenario. I'm not saying this is one of those cases, but you may have a scenario where no duty to defend, even though that duty is generally broader, but ultimately a duty to indemnify. Actually, I've had cases, defending auto cases, where that's happened. And maybe I spoke too flippantly. The obligation to defend would have come up during the course of the trial, which then, of course, creates the obligation to indemnify. At that time, a defense lawyer who was there, not because he was hired by the insurance company, would have put the insurance company on notice. By the way, guys, this is . . . guys and girls, this is what happened during the course of this trial, and you better come in here and finish up the defense of the case. All right. Thank you very much, Mr. Weiss. Mr. Kammerer. Okay, Mr. Kammerer, whenever you're ready. I am ready, Your Honor. May it please the Court. My name is Ronald Kammerer, and I represent Midcontinent Casualty Company. And I want to start out by addressing, if I may, the second argument, which is the election of remedies, and then going back to the argument regarding the contract. Well, let me just tell you, you can structure your argument the way you see fit. They didn't really talk about election of remedies, so you're certainly free to raise it. If you do, I'm going to let them talk about it in their rebuttal argument. But it's your choice about how to proceed. That's fine. And I'm not going to spend a lot of time on election remedies, but I wanted to address some of the points raised by Judge Kugler, because it is undisputed that over $300,000 of benefits were received by Mr. Blue from approximately the date of the accident up to the date we took the deposition of Ms. Trotter from Builders Insurance Company. And there was a statement made about this may have been a voluntary payment, and that's what I wanted to address. That's not the case at all. And what makes this case totally distinguishable from the Jones case is that in this case, Mr. Blue filed a petition seeking benefits when that petition was originally denied, in part because of the questions about employment status and what Mr. Arpin said, because he originally claimed that he was the direct employer of Mr. Blue. The claim was denied. And then when they did investigation, Builders did the right thing. They went out and they investigated. It's all in Ms. Trotter's deposition. And they determined that Mr. They even hired a lawyer to look at it. They determined that Mr. Blue was a statutory employee, and they sent him checks, two checks every single month since that time. And that represents a conscious decision by Mr. Blue to accept those benefits, which he's accepting, I presume, up to and including today. And in fact, when we took the deposition of Mr. Blue's girlfriend, whenever the check may have been late, what did she do? She would call and say, where's the check? And if that doesn't show a conscious attempt, I don't know what does. There's a reference in one of the briefs. I forget which one. There's a reference to a statement or purported attempt by Mr. Blue to either return the checks or stop the payments that was unsuccessful. What does the record say about that? Mr. Blue testified in his deposition that at one time he tried to return a check. He contacted the insurance company, and the insurance company told him that the money was rightfully his. But what there's no dispute about is that every single one of these checks that were sent were cashed. And the one thing about making, if you assume what Mr. Blue, and for the purposes of appeal, I am, is true. And there is a dispute about that fact, but I don't think it's a material fact because he still accepted and cast the checks. Then under the case law, Your Honor, which we cite, which is primarily the Vallejo case, that is an effective election of remedies. And the only case that was cited, and this is talked about in the brief from the other side, is the Florida Supreme Court case of Jones. And Your Honor, this wasn't addressed in the opening argument, but I will just say before moving to the main argument on the contract, is that the Jones case is clearly distinguishable. If you look at the certified question in the Jones case, the certified question was whether an injured employee who was entitled and received workers' compensation benefits, but had not pursued the compensation case to its conclusion, to later, and this is one of the two key facts which makes Jones distinguishable. To sue his employer for injuries that arise out of intentional conduct, that's what's not barred. And if you look at the Vallejo case, that is why Jones is distinguishable because what the Jones court goes on to say is obviously in the workers' compensation setting, because intentional conduct is not part of workers' comp, that's an exception, that if someone intends and accepts for the negligence action, the workers' compensation benefits, that is not an election, not to pursue an intentional conduct theory, which was not alleged here and was not pursued. The second thing about the Jones case, and a lot of the cases that are cited in the blue brief, is that here you had an actual filing of a petition and collection of benefits, where in some of the cases they relied on, the company in those cases, unlike here, did, before a petition was even filed, made those voluntary payments, and the only action in those cases which makes them distinguishable is that they attempted to make a modification as to the amount of the payment, and the Supreme Court in Jones, and it's followed by one of the other cases that are cited in my opponent's brief, said that's not a conscious election. So the point I want to make here is that the Jones case is not controlling. The Vallejo case, which is decided after Jones, adopts the position which I'm arguing here. So the workman's comp carrier in this case made payments based on its investigation, but without a valid pending petition from Mr. Blue? That's not correct, your honor. There was a valid pending petition from Mr. Blue. Denied or dismissed because of the error. The petition was dismissed, it's undisputed in the record, that the petition was dismissed because they were paying, was dismissed without prejudice, because Builders was paying its benefits, and there was no need to go to a mediation because the parties were in agreement as to what benefits were owed. The voluntary dismissal is a red herring. I'm not saying your argument is wrong. I'm just trying to get some factual clarification. Normally when a petition is dismissed, it's no longer pending. So practically you might be right, but I just want to get the procedural history correct. He did not refile the petition after dismissal. Is that correct? That is correct because he continues to receive benefits. There would be no need to do so. I know that, I know that. And if I misspoke about that, I apologize. No, you didn't. I just wanted to get a clarification. What I may have, and I just wanted to be very careful. Let me make sure I understand. Are you saying, at least I think this might be what you're saying, originally a claim was made for Workman's Compensation benefits, not with the court, just a claim to the insurance cover Builders? It was a formal process initiated by Mr. Blue. He retained the petition. He signed the petition? Right, and he was represented by a lawyer by the name of Ms. Vega, and that's in the record from the, mainly from the deposition. And that was originally denied? Correct. And it was denied because he was not an actual employee? Is that what the grounds were given? There was some inconsistencies about what Builders was told, which you highlighted, Judge Kugler. They did sufficient investigation because they realized, although he was not an actual employee, and he was a statutory employee, and then began to give benefits relying on the Orama case. All right, hang on, hang on. So they started paying him benefits? Correct. And at some point in time, he filed a lawsuit for Workman's Compensation benefits? No, the petition for benefits was filed. As I recall the facts, and I think I'm correct, is the petition was filed. It was originally rejected, but I don't think another petition was filed. I think it's only the one petition. All right, so he never filed an actual claim with the court for Workman's Compensation benefits? To me, the petition and the claim is one and the same. He actually affirmatively undertook steps to get comp benefits, unlike the situation in Jones. And generally in Florida, if you're receiving, if you're an employee receiving Workman's Compensation benefits, the law of Florida and the state is you're prohibited from claiming or getting benefits, or not benefits, but damages as a result of negligent conduct. 100% correct. And this is, they hit, this suit was involving negligence and allegation of negligence. That's it, that's all that's alleged. If they turn around and sue you for wanton reckless conduct, I assume that would be not barred by the Workman's Compensation or the fact that Mr. Blue was a statutory employee of, or alleged to be a statutory employee of our... That is not alleged. I'm not sure whether that claim would be barred or not at this time since the accident happened in 2010, but that's all the Jones case stands for. Okay. But you've doubt, Judge, thankfully led me right into the Arama case. And the first thing that I want to say to the court is Arama is not, is not an outlier. And how do we know that? Because this court, in a case involving my client, which I was not involved in, Stevens versus Midcontinent Casualty Company rejected the very same arguments made by Mr. Anderson here. And the Stevens that's cited in our brief is a 2014 decision. And the argument that was raised by Stevens, who was the injured party there, it says, Stevens cites the testimony of Jack Fritz, who stated that he had not entered a contract with Anchorage, which was Midcontinence insured, for the Kirkland project. The Kirkland project would be like the Faith Deliverance Project in this case. But this evidence does little to further Stevens' case as a written contract is not necessary to establish a contractor-subcontractor relationship citing Arama. But that's, nobody disputes that part of it because everybody agrees that you can have an unwritten agreement. Let me finish. The court that the 11th Circuit goes on to state in Stevens, here the relationship was established through the course of conduct by Anchorage and Team Fritz and by the owner-slash-contractor agreement in which Anchorage assumed, again by pulling the permit, the legal position of general contractor for the job once again citing Arama. Without any compensation or anything in return whatsoever? In Arama, they don't talk about whether there was or was not compensation. I don't believe that issue was addressed in Stevens. But here, there was a tax letter given and the only evidence about the tax letter is an out-of-court declaration which my opponent's claim is admissible under the state of mind. But even if you accept that... But before you even get to that hearsay issue, what in the world is the genesis of this tax benefit? Where does it come from? It's testified to it about in both Mr. Arpin's deposition and in Mr. Rory or Pastor Rory's deposition. Okay, where does this thing come from? Mr. Arpin testifies in his deposition that he had spent a substantial time and money assisting the church and that what he did to arrive at the price in the agreement, which is a rather odd price, but it's $12,337. When he arrives at that price, because he looks at such factors as his overhead, the cost of insurance and things of that nature, and then he presents that invoice, which says construction services, including permitting... No, no, I know the details and the nuts and bolts of the invoice and the letter. I want to know if there's an answer to the legal basis for this thing. Is this part of the IRS code that if you provide services to a non-profit, you get a tax deduction or some sort of a tax credit or benefit? Is it based on state law and the state income taxes you have to pay for a business? Where does it come from? The record is silent on this. I think, and I don't think I'm wrong about this. I think Mr. Arpin thought it would be helpful on his federal law because... I know what he thought. I want to know where it comes from, because if you agree to consideration, which is non-existent as a matter of law, that adds a wrinkle to this case. So, for example, if you and I agree that you're going to provide legal services for me, and my consideration to you is that I promise you to give you blue skies in Miami at least several times a week, that's not a contract. I agree, that's not a contract. So, play along with me. Okay, I am. If Mr. Arpin requests a tax benefit of whatever kind, which is non-existent, non-available under law, whatever law might apply, my concern on a general level is, where is the consideration for that agreement? Below, we did reference in our motion for summary judgment, which the court had before it when it granted the motion, is that a tax letter is valid consideration because that is bestowing a benefit. And the fact that Mr. Arpin may have thought that that tax benefit had absolutely no benefit at all does not prove that the tax letter that he got, which he discussed with Rory, and then Rory, the invoice, and then Pastor Rory gave him the tax letter back. That's the evidence that the trial court considered when it granted the motion for summary judgment. There was no evidence to the contrary. What is the legal basis for saying that a tax letter is consideration? What we cited in our papers below was a court case that said that giving a tax benefit letter is valid consideration. As long as the tax benefit exists, and I can't find anywhere where you get this sort of a credit. So Habitat for Humanity goes out and performs a charitable act by building a home or building an annex to a church, it gets to request, that's probably not a good example because Habitat is itself a nonprofit, but let's say Lowe's decides to donate lumber and services and builds an annex to a church. They get to deduct the services and the property and the material they submitted. It's not in the facts here. The facts here is that Faith Deliverance Church. No, no, these are the facts here. Lowe's is ARPAN, okay? Yes. Lowe's says, I am going to donate lumber, services, etc. We're going to build an annex to your church. We don't want any payment for it. They then ask the church for a tax letter for $20,000 for materials, services, etc. for building the annex. The church says, I'll give you whatever you want. I got my annex. I'm very happy to give you a tax letter. Yes, you provided $20,000 worth of services. Here's your letter. What does Lowe's do with that letter? According to the case law we cited in the motions for summary, Judge Impello, that is valid consideration because that is a benefit because in your example, Your Honor, Lowe's is providing a service, free lumber, free carpentry, whatever. And that has a monetary value. Only if the IRS recognizes it. I agree with that, but if you, in this particular case, the undisputed evidence is that the sales contract and the tax letter existed. Under the law, that's valid consideration. The only evidence you have to the contrary is not that it's invalid. That's, I mean, I've met my burden of proof. It's not that it's invalid. It's an out-of-court declaration by an accountant who allegedly told Mr. Arpin that it wasn't worth the paper it was printed on. All right, what about- That's not, that's not an issue. That does not create an issue of fact. Okay, second question with regards to that invoice and the letter. They post-date the accident in this case. What is the relevance of that, if any? Two comments, Your Honor. Number one is that in the Stevens case, there was also not a contemporaneous contract and still the court found that Mid-Continent in that case was entitled to summary judgment, number one. Number two is that the contract and what was going on between Arpin and Pastor Rory, even though it was post-accident, it was still one of the job was ongoing and there was no case law cited in my opponent's brief. We don't believe that as long as there's a meeting of the minds and the testimony between Rory and Arpin was a meeting of the minds as here's the invoice, here's the tax letter. The fact that it was after the accident, we could find no case that says that that has any legal significance and in fact, the Stevens case would suggest to the contrary. All right, Mr. Cameron, we've taken you way over your time, but we thank you very much. Thank you very much as well. Okay, Mr. Anderson. I've got a lot to unpack there. Okay, well, you've got three minutes. I understand. Limit your suitcase. Okay, thank you. Quickly, to go right to your last point, Judge Jordan, we haven't found any case and neither have they that says you can create an ex post facto consideration that is supposed to relate back in time to the time of this accident. What happened here is the agreement, the nebulous pro bono agreement between Arpin and Sons and Faith Deliverance Church occurred sometime before November 2008. 2008, because that's when the permits were first pulled. The accident in this case occurred in July 2010 and it was not until October 8th of 2010, several months after the accident, that Don Arpin, as his deposition which I read to you already shows, came up with the idea, unsolicited, just came up with the idea that, hey, you know what? Maybe I can get a tax break. So he sends this so-called invoice to Faith Deliverance Church and Pastor Rory, it's by the way, the so-called tax letter is unsigned. Pastor Rory testifies he doesn't even know who sent him the invoice. And he also, what's also important here is that in his deposition, Mr. Arpin testifies that the actual contents of the invoice is inaccurate because he never provided on-site service. He was, by the way, he never visited this accident site before the accident. Let me ask you this question because isn't it true that we as a court ordinarily do not go back and evaluate the consideration in a contract, generally speaking? Oh, well, we cite cases. No, I don't agree with that generally. Not when there is zero consideration. We've cited a case for that and also . . . All right. When you have a situation like this where someone does something for a charity, is it not oftentimes the consideration that the entity is attempting to build its own book of business or perhaps it's building reputation? And I think there was some evidence perhaps of, although I don't know if it was argued in the district courts, of being introduced to the members of the congregation as this is our general contractor, thus perhaps building business. The whole idea of tax benefits when you give services to a not-for-profit like this, isn't those undisclosed things the reason why a court oftentimes does not even go back and look at consideration? Well, Your Honor . . . Because it's hard to evaluate? I respectfully disagree. In this case, the burden was on MidContinent to sustain their burden of proof on summary judgment. It was their burden to prove that this was a legit, valid tax benefit which the judge erroneously concluded. So I don't think it should be incumbent upon us to divine what this was, especially when the two participants to this so-called agreement admit that it never even was mentioned or thought about before the accident in this case occurred. Let me jump you to a different thing as well. Isn't it true that your client can't sue or can't succeed in a suit against ARPN for negligence alone, in other words, non-intentional conduct, reckless conduct, if your client is found to have received workman's compensation benefits? No, because in the Jones case, which we cite, and incidentally my opponent's wrong, Jones is not limited to intentional tort cases. We cite the Vasquez case, which is subsequent to Jones. It's from the First District Court of Appeal. What Jones says is that the acceptance of benefits does not necessarily constitute an election of remedies. It does not constitute an adjudication of the merits of the underlying compensation, workers' compensation issue, and it does not constitute proof as a matter of law that there was a conscious, deliberate attempt to choose workers' compensation benefits over a tort action, which is what we have here. It seems to me that someone's decision to accept benefits is highly probative of whether or not that person has chosen to go down that road as opposed to a road of you know, those things are both occurring at the same time, Your Honor. The original lawsuit was filed several years ago, and like I've mentioned before, the workers' comp insurance carrier in this case knows exactly what is happening here and the positions that parties have been taking. There's no, there's nothing shady going on, respectfully. So what we think is at the very least, this should be a jury issue to determine these are matters of intent. So it should be something that should not be determined as a matter of law on summary judgment and as not to bring up another issue, the trial judge never addressed the election of remedies issue in light of its other holding. So based on everything that I've said today, Mr. Weiss has said, and what we said in the briefs, we respectfully request that the summary judgment and judgment entered on it be reversed. Thank you. All right. Thank you all very much.